**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Biyata Mashona M.,                                    Case No. 21-cv-00633 (HB)

                    Plaintiff,

v.                                                                **ORDER**

Kilolo Kijakazi, Acting Commissioner
of Social Security,

                    Defendant.

---

HILDY BOWBEER, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Biyata Mashona M. seeks judicial review

of a final decision by the Commissioner of Social Security denying her application for

supplemental security income.  This matter is before the Court on the parties' cross-

motions for summary judgment [ECF Nos. 21, 24].  The parties consented to the

undersigned judge's jurisdiction.  For the reasons set forth below, the Court grants

Plaintiff's motion and denies Defendant's motion.

I.        **BACKGROUND**

        A.        **Procedural Background**

        On February 23, 2019, Plaintiff applied for supplemental security income (SSI),

alleging disability beginning August 20, 2002.  (R. 16, 222[1].)  The Social Security

Administration (SSA) denied the claim initially on March 21, 2019, and upon

---

[1]  The Court cites the Social Security Administrative Record as "R." and uses the
pagination that appears in bold in the lower right corner of each page.

reconsideration on May 21, 2019.  (R. 68, 76.)  Plaintiff requested a hearing before an

Administrative Law Judge (ALJ), which was held on July 9, 2020, and at which she

appeared and testified.  (R. 34–35, 105.)  A vocational expert also testified.  (R. 35.)  The

ALJ denied her claim on August 7, 2020.  (R. 13.)  The Appeals Council denied

Plaintiff's request for a review on January 5, 2021.  (R. 1.)  Plaintiff then appealed the

ALJ's denial of benefits to this court on March 4, 2021.  (ECF No. 1.)

**B.     Relevant Records**

The Court will recount the record evidence only to the extent it is helpful for

context or necessary for resolution of the specific issues presented in the parties' motions.

Plaintiff challenges the ALJ's finding that she did not have any severe impairments and

the ALJ's assessment of her subjective symptoms and weighing of medical opinions,

(Pl.'s Mem. [ECF No. 22]), so the Court focuses on the records pertinent to those issues.

**1.     Plaintiff's Medical and Functional Capacity Records**

On June 28, 2018, March Berliant, M.D., and Conrad David Gleber, M.D., started

treating Plaintiff.  (R. 305-09.)  She was noted to have a history of domestic abuse and

history of alcohol abuse.  (R. 305.)  She had depression and anxiety, but she believed it

was controlled without medications.  (R 305.)  Mental status exam showed no deficits or

concerns.  (R. 305.)

On November 8, 2018, mental health counseling intern Shantel Giles treated

Plaintiff.  (R. 309–12, 404.)  Plaintiff reported she was upset often, and she would worry

and be nervous a lot.  (R. 309.)  She had post-traumatic stress disorder (PTSD) related to

witnessing the murder of her fiancé in front of her in 2002.  (R. 309.)  She stated, "I need

2

something to help me, I do not know what else to do." (R. 309.) She had past marijuana and alcohol use. (R. 309.) She had past therapy for about 2 years and did not believe therapy helped her process depressed symptoms. (R. 310.) Her current stressors related to medication issues and trauma. (R. 310.) Her PHQ-9 score was 16, and her GAD-7 score was 12[2]. (R. 310.) Her mental status examination noted disheveled and unkempt appearance, limited eye contact, dysphoric and irritable mood, good attention span, fair insight, and fair judgment. (R. 310–11.) She had depression with crying spells, depressed mood, decreased appetite, energy, and sleep, and thoughts of worthlessness and that she would be better off dead. (R. 311.)

On November 13, 2018, Plaintiff appeared depressed with teary eyes for an appointment with Giles. (R. 312.) She reported emotional abuse by her current boyfriend. (R. 312.) She was prescribed sertraline. (R. 313.) Her PHQ-9 score was 14, and her GAD-7 score was 17. (R. 313.) Mental status examination noted disheveled appearance, limited eye contact, dysphoric mood, depressed affect, fair insight, and fair

---

[2] The PHQ-9 is a questionnaire of self-reported depression-related items used in primary care settings to make tentative diagnoses of depression and to monitor depression severity and response to treatment in the past two weeks. Kroenke, K., Spitzer, R. L., and Williams, J. B. W., THE PHQ-9: VALIDITY OF A BRIEF DEPRESSION SEVERITY MEASURE, 16(9) J. Gen. Intern. Med. 606 (Sep. 2001). PHQ-9 scores of 5, 10, 15, and 20 represent mild, moderate, moderately severe, and severe depression, respectively. (*Id.*) GAD-7 is a similar tool for diagnosing and monitoring Generalized Anxiety Disorder and other anxiety disorders like Panic, Social Anxiety, and Post-Traumatic Stress Disorder. National HIV Curriculum, GENERALIZED ANXIETY DISORDER 7-ITEM, https://www.hiv.uw.edu/page/mental-health-screening/gad-7 (last visited June 19, 2022). GAD-7 scores of 4, 9, 14, and greater correlate with minimal, mild, moderate, and severe anxiety, respectively, with a score of 8 or more representing a reasonable point for identifying probable generalized anxiety disorder. (*Id.*)

judgment.  (R. 313.)

On November 13, 2018, Giles and Katie Rauber, NP, completed a psychological assessment for determination of employability for Monroe County Department of Human Services.  (R. 400-04.)  Plaintiff had 2 evaluations since November 8, 2018.  (R. 400.) She had depression symptoms since age 13 and PTSD symptoms since the death of her fiancé in 2002.  (R 401.)  Mental status examination showed depressed and irritable mood.  (R. 402.)  Her GAF score was 50.  (R. 403.)  Concerning functional limitations/clinical observations, she was moderately limited, defined as unable to function 10-25% of the time, in the abilities to: (1) maintain attention and concentration for rote tasks; and (2) regularly attend to a routine and maintain a schedule.  (R. 403.) They estimated she could not work for three months because her depression symptoms were too severe to concentrate, and she had difficulty sleeping and suffered overwhelming anxiety and irritability around groups of people.  (R. 404.)

On November 28, 2018, Plaintiff reported feeling both "good" and "stressed," but the medication helped with her depression and crying spells.  (R. 314.)  She was stressed and afraid about a possible eviction, and she believed her depression would increase if she lost her housing.  (R. 314.)  She had difficulty concentrating while reading, but enjoyed word search puzzles.  (R. 314.)  Her PHQ-9 score was 6.  (R. 315.)  Mental status examination noted good attention span, fair insight and judgment.  (R. 316.)

On December 14, 2018, Plaintiff reported to Rauber that her medication helped her feel more calm and improved her mood, but she still felt anxious and impatient at times.  (R. 317.)  She reported fair energy, good concentration, and good sleep.  (R. 317.)

4

Mental status examination noted concentration within normal limits, and intact judgment and insight.  (R. 318.)  Rauber noted Plaintiff showed general symptom improvement. (R. 318.)  Rauber increased her dosage of sertraline.  (R. 318.)

On January 17 and 22, 2019, Plaintiff reported to Giles increased depression and stress since she became homeless; she was in a shelter and then in a hotel.  (R. 319–320, 322.)  She had thoughts that she would be better off dead, and had recently dropped her phone in the toilet leaving her feeling that she had no way to find help.  (R. 320, 322.)  She stopped taking her medication due to stress.  (R. 322.)  Her PHQ-9 scores were 10 and 8.  (R. 320, 323.)  Mental status examinations noted dysphoric mood, depressed affect, good attention span, fair insight, and fair to poor judgment.  (R. 321, 323.)

Plaintiff saw Giles on February 5 and 14, March 26, April 9, 16, and 23. (R. 325–30, 345–53, 356–58.)  She reported varying feelings, swinging from better to miserable, hopeless, and "numb" when she could not find a new apartment; she had no interest in working because being around others gave her anxiety and she could not identify a job that avoided other people.  (R. 325, 328, 345).  Her anxiety and depression remained high and she feared being evicted again once she found housing, but she started feeling better and hopeful, and reported decreased stress due to DSS reinstating her case.  (R. 348, 350, 351.)  On April 23, she felt "focused" and "good."  (R. 356.)  She had PHQ-9 scores at 8, 7, 13, and 11, and GAD-7 scores at 11 and 20. (R. 325, 329, 346, 349.)

Mental status examinations over this period yielded varying reports.  From February through mid-April, she showed dysphoric mood (R. 327); euphoric and depressed mood (R. 329, 347); anxious mood (R. 349, 352); anxious affect (T 349, 352);

5

depressed affect (R. 349, 352); good attention span and concentration (R. 327, 329, 347,

349, 352); fair insight (R. 327, 329, 347, 349, 352, 357); and fair-to-poor judgment (R.

327, 329, 347, 349, 352, 411).  On April 23, she showed happy mood, appropriate affect,

good concentration, fair judgment and good insight.  (R. 357.)

On April 9, 2019, Giles and Rauber completed a Medical Source Opinion

Psychological form.  (R. 332-34.)  Treatment was noted for 5 months for major

depressive disorder, PTSD, and anxiety disorder.  (R. 332.)  Her current and highest GAF

score in the last year was 50.  (R. 332.)  Signs and symptoms were identified as:

depressed mood; diminished interest in almost all activities; appetite disturbance with

change in weight; sleep disturbance; decreased energy; feelings of guilt or worthlessness;

difficulty concentrating or thinking; thoughts of being better off dead; flight of ideas; and

distractibility.  (R. 332.)  Concerning mental abilities and aptitudes needed to do

unskilled work, Giles and Rauber opined that Plaintiff was unable to meet competitive

standards in the ability to complete a normal workday and workweek without

interruptions from psychologically-based symptoms.  (R. 333.)  They found Plaintiff

"seriously limited, but not precluded" in the abilities to: (1) maintain attention for two-

hour segment; (2) maintain regular attendance and be punctual within customary, usually

strict tolerances; (3) accept instructions and respond appropriately to criticism from

supervisors; and (4) respond appropriately to changes in a routine work setting.  (R. 333.)

The evaluation form defined that level of restriction to mean, "on a day-to-day basis in a

regular work setting," the claimant's "ability to function in this area is seriously limited

and less than satisfactory, but not precluded in all circumstances."  (R. 333.)  Plaintiff

was assessed as having marked limitations in the abilities to: interact with others and

concentrate, persist or maintain pace; she had moderate limitations in understanding,

remembering, or applying information and adapting and managing herself.  (R. 334.)

Plaintiff would likely be absent more than four days per month on average as a result of

her impairments or treatment.  (R. 334.)

Giles and Rauber also completed a psychological assessment for determination of

employability for Monroe County Department of Human Services on April 9, 2019.  (R.

395–98.)  Plaintiff had nine evaluations since November 8, 2018, with the most recent

evaluation on April 9, 2019.  (R. 395.)  They described Plaintiff's reports of depression

symptoms since age 13, PTSD symptoms since the death of her fiancé, and

overwhelming anxiety that caused distress and limited social interactions.  (R. 395.)  She

had occasional repetitive violent actions towards self or others, only occasional

appropriate interactions with others, and occasional behavior interfering with activities of

daily living.  (R. 396.)  Concerning functional limitations/clinical observations, Giles and

Rauber stated she was "moderately limited," defined on that form as unable to function

10-25% of the time, in the abilities to: (1) follow, understand, and remember simple

instructions and directions; (2) maintain attention and concentration for rote tasks; and (3)

regularly attend to a routine and maintain a schedule.  (R. 397.)  They estimated she

could not work for three months because her depression symptoms were too severe to

concentrate, and she had difficulty sleeping and suffered overwhelming anxiety and

irritability around groups of people.  (R. 397.)

On May 7, 2019, Plaintiff reported to Giles feeling "alright" and her depression

7

was manageable, though she had increased anxiety because her phone was "off" and she likely missed important calls, she was sharing a bathroom at her housing, and she felt she could not depend on her family. (R. 410.) Her PHQ-9 was 9. (R. 411.) Mental status examination noted fair judgment, but no other concerns. (R. 411.)

On May 14, 2019, Plaintiff told Rauber she was "going haywire"; her housing situation was unstable as she moved from a shelter to a motel that she had to leave by May 31. (R. 417.) She was supposed to be placed in a domestic violence shelter but there was no room. (R. 417.) She took her medication inconsistently and her depression worsened when she was off it, and it sometimes seemed to work and other times her anxiety was bad. (R. 417.) She reported nightmares and flashbacks, had poor energy, difficulty falling and staying asleep, and poor general enjoyment/interest. (R. 417.) She reported thoughts of hurting other people in her building. (R. 418.) She reported breakthrough anxiety when PTSD symptoms were triggered, for which Rauber prescribed hydroxyzine as needed. (R. 418.) Mental status examination showed depressed mood with no other concerns. (R. 418.)

On September 5, 2019, Plaintiff reported to her primary care provider, Jenny Schreiber, M.D., that she was homeless and staying with a friend until security removed her. (R. 421.) She was unable to afford food and would not get a meal until tonight from her mother. (R. 421.)

On September 12, 2019, Plaintiff reported to Schreiber that she was living with her parents and her priorities were getting a job as a home health aide and finding housing. (R. 428.) She reported taking sertraline daily and hydroxyzine as needed a few

times per week.  (R. 428.)  She stated she used to drink heavily but now only drank two beers per week.  (R. 428.)  She reported her depression and anxiety were well-controlled with the medications.  (R. 430.)

It appears Plaintiff did not again seek treatment from a mental health provider until January 22, 2020, when she saw David Szulgit, LCSW-R, and told him she was seeking treatment with him because her representative told her she needed to be seen for a psychosocial assessment to assist in her Social Security appeal.  (R. 449.)  Her goal was to stabilize and improve symptoms.  (R. 449.)  She reported being tired of everything and without energy to work on therapy.  (R. 449.)  Mental status examinations showed appearing older than stated age, anxious and depressed mood, good concentration, fair judgment, and fair insight.  (R. 451.)

Plaintiff also saw Rauber on January 22, 2020, and stated she was staying with her ex-husband.  (R. 437.)  She reported low energy due to illness; poor concentration; and disturbed and interrupted sleep most nights by dreams of her murdered partner.  (R. 437.)  She took her medication inconsistently, and her mood was up and down but consistently depressed; she played and enjoyed phone games as a way out of her head.  (R. 437.)  Mental status examination showed restricted affect, depressed mood, concentration within normal limits, and fair insight.  (R. 438.)  Rauber increased her dosage of sertraline and recommended that she take it consistently.  (R. 438.)

On February 3, 2020, Rauber completed another medical source opinion.  (R. 433–36.)  Rauber reported four meetings with Plaintiff since November 13, 2018, and reviewed Giles's notes for meetings between November 2018 and May 2019.  (R. 433.)

She noted that Plaintiff started with a new therapist on January 22, 2020.  (R. 433.)  Signs and symptoms were identified as depressed mood; sleep disturbance; decreased energy; difficulty concentrating or thinking; and fleeting/passive thoughts of death or suicide.  (R. 433.)  Concerning mental abilities and aptitudes needed to do unskilled work, Rauber opined Plaintiff was unable to meet competitive standards in the abilities to: (1) maintain attention for two-hour segment; (2) maintain regular attendance and be punctual within customary, usually strict tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being unduly distracted; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms; (6) perform at a consistent pace without an unreasonable number and length of rest periods; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (9) respond appropriately to changes in a routine work setting; and (10) deal with normal work stress. (R. 434.)  Plaintiff had marked limitations in the abilities to concentrate, persist or maintain pace, and adapt or manage oneself; she had moderate limitation in interacting with others.  (R. 436.)  Rauber marked boxes indicating that Plaintiff had a medically documented history of a disorder over a period of at least 2 years, and there was evidence of both: (1) ongoing medical treatment, mental health therapy, psychosocial support(s) with "occasional brief gaps in care" that diminished the symptoms and signs of the disorder; and (2) marginal adjustment, that is, minimal capacity to adapt to changes in Plaintiff's environment or to demands that are not already part of her daily life.  (R. 436.)

10

Rauber concluded Plaintiff would likely be absent more than four days per month on average because of her impairments or treatment.  (R. 436.)

On February 14, 2020, Plaintiff reported to Rauber that she was taking her medication consistently, but unbeknownst to her, her insurance had run out so she could not get a refill.  (R. 468–469.)  Plaintiff described her mood as up and down with a racing worry about "something bad happening," her energy and appetite were poor, concentration and enjoyment/interest were fair with phone games as a distraction, and she continued to have anxiety and worry over the stability of her current living situation.  (R. 468–69.)  However, the mental status examination results were described as normal, good, and intact mental state, and Rauber found her to be "overall in better spirits.".  (R. 469.)  Rauber increased her hydroxyzine dose to assist with acute anxiety.  (R. 469.)

On February 14, 2020, Plaintiff reported to Szulgit that she had a stable living situation, but she still felt lots of worry and anxiety ("always waiting for the next bad thing to happen").  (R. 473.)  She reported a routine of cleaning the house, making dinner for her roommates, and watching movies, playing phone games, and doing word puzzles to stop ruminating and worrying.  (R. 473.)  On mental status examination, she appeared older than her stated age, and displayed a guarded attitude, anxious and depressed mood, good concentration, fair judgment, and fair insight.  (R. 475.)

On March 5, 2020, Plaintiff told Gleber she could not work due to her psychiatric illness and PTSD-type symptoms.  (R. 480.)

On April 4, 2020, Plaintiff was treated in the emergency room and disclosed that she drank about four cans of beer and smoked K2-laced marijuana that day and was

11

found stumbling around a park near her home.  (R. 484.)  The doctor's notes confusingly state that Plaintiff reported she "usually drinks about 15-30 beers a day" but also that she drinks only 4 cans a week.  (R. 484–485.)  The notes also state Plaintiff was repeatedly yelling out to the staff and DPS, wanting to go home.  (R. 494.)

On April 14, 2020, Plaintiff had a telephone consult with Rauber and told her about the emergency department incident, explaining that she had a conflict with a roommate, felt like she wanted to hurt him, and was really stressed for a few days.  (R. 508.)  She left the house and started getting irritated and angry toward anyone she came across; she almost assaulted a stranger, and a police officer had to place her in a mental hygiene arrest then take her to the emergency department.  (R. 508.)  She admitted to smoking K2 but denied using any alcohol despite the reports.  (R. 508.)  She admitted to an episode of drinking in early March.  (R. 508.)  Rauber noted that over the phone Plaintiff did not sound intoxicated.  She expressed remorse at her outburst and denied current plans or intent to hurt her roommate.  (R. 510.)  Plaintiff was concerned that her mood became agitated so quickly and the hydroxyzine did not help in the moment.  (R. 510.)

Rauber's notes of that consult also indicate that Plaintiff reported generally struggling with social isolation and easily triggered agitation due to the COVID-19 pandemic and felt anxious on the bus with crowds because she worried about catching the virus.  (R. 508.)  Plaintiff stated she was taking sertraline every day and that she had tried higher doses of hydroxyzine but it did not help her anxiety.  (R. 508.)  She reported fair energy and concentration; insomnia; and good appetite.  (R. 508.)  Mental status

examination showed neutral mood, good concentration, mildly impaired judgment, and fair insight. (R. 509.) Quetiapine was prescribed, and hydroxyzine was discontinued due to being ineffective. (R. 510.) Rauber wondered if substance abuse might be contributing to Plaintiff's current agitation, noting that Plaintiff had previously denied ongoing alcohol abuse and Rauber had not suspected any, but Plaintiff's history of severe alcohol use and tendency to self-medicate with substances placed her at high risk of relapse. (R. 510.) Rauber noted her intention to continue to monitor and question Plaintiff's alcohol use. (R. 510.)

On April 14, June 12, and July 1, 2020, Szulgit provided individual psychotherapy by telephone. (R. 500–07, 525–36.) Plaintiff was isolating the majority of the time, staying in her room to watch movies and TV and play video games, except when she had to go out to get essentials. (R. 501.) She found the bus to be anxiety-provoking due to the crowds. (R. 501.) She had violent ideations toward her roommate in early April, which continued through June, so she started staying with a friend where she felt relaxed and unstressed, could talk with her friend, play games on her phone, and watch TV. (R. 501, 522.) In June, she was irritable with people in the community, and her voice was hoarse from yelling at people to stay away from her. (R. 522.) She recognized her own agitation and irritation and made efforts to avoid conflict where possible. (R. 526.) Mental status examinations showed guarded attitude (R. 503); anxious and depressed mood (R. 503, 524); irritable mood (R. 524); good concentration (R. 503, 524); and fair judgment and insight (R. 503, 524).

On June 12, 2020, Plaintiff reported to Rauber that she had anxiety because her

adult son was in a psychiatric unit, and (in line with her reports to Szulgit) she had thoughts of harming her roommate and there had been some verbal explosive episodes, so she was staying at a friend's house because she felt calm when she was not at home.  (R. 516.)  Quetiapine made her very sleepy, and she was sleeping well so long as she was in a safe environment.  (R. 516.)  She reported fair concentration and poor enjoyment/interest.  (R. 516–517.)  Mental status examination showed irritable mood, normal concentration, mildly impaired judgment, and fair insight.  (R. 517.)  Rauber observed that Plaintiff was easily dysregulated and irritable, with her roommate as a trigger.  (R. 518.)  Dosage of quetiapine was increased to assist with mood stability.  (R. 518.)

On July 1, 2020, Plaintiff reported to Szulgit that she was moving to Minnesota to be with her son.  (R. 529.)  Mental status examination showed anxious, depressed, and irritable mood, full range affect, good concentration, and fair judgment and insight.  (R. 531–532.)

## 2.    State Agency Records

Non-examining state agency medical consultants reviewed Plaintiff's application initially and on reconsideration.  In March 2019, the initial consultant found she had impairments in the form of depression, a trauma disorder, and anxiety, but she had only mild limitations in her functioning based on her medical reports, and her impairments were not severe.  (R. 65–68.)  Another consultant made the same findings on reconsideration in May 2019.  (R. 73–76.)

## 3.    Hearing Testimony

Plaintiff testified that she was not able to work because she could not focus or

concentrate and became overwhelmed and anxious when other people were around her.
She stated she was feeling anxious during the hearing because of talking with the ALJ.
(R. 47.)  She testified to taking a prescribed anxiety medication, and even took one during
the hearing to try to calm her anxiety.  (R. 47, 53.)  She reported that her stress had
caused her to lose 20 pounds in the past year, and she felt anxious at the time because one
of her children was having difficulty with treatment in a psychiatric hospital.  (R. 49.)
She testified to an inconsistent sleep schedule, unable to sleep for long periods followed
by sleeping 12–13 hours due to exhaustion (R. 50.)  She described how she could not
cook, do chores, or clean her home due to anxiety and inability to care, so her children
and ex-spouse handled those tasks for her.  (R. 50–51.)  She also did not care how she
smelled or whether she bathed, and at the time of hearing had not showered in four days.
(R. 51-52.)  Her family members generally shopped for her because she started
hyperventilating arounds crowds of people.  (R. 52.)  She used to enjoy roller skating,
playing ball, watching movies, and reading, but no longer felt that joy and could not
concentrate on any of those activities well enough to do them.  (R. 52–53.)  She tried
word searches to calm anxiety but could not concentrate.  (R. 53.)

The ALJ asked the vocational expert whether a hypothetical person could do work
in the national economy with the following hypothetical restrictions: Plaintiff's age,
education, and work experience; no physical exertional limitations, only able to perform
unskilled, simple, routine tasks; may have frequent [inaudible] with supervisors, but only
occasional interaction with coworkers and the general public; and can tolerate occasional
changes to a routine work setting.  (R. 57.)  The vocational expert testified the person

could work, and gave examples of a commercial cleaner, with 200,000 full-time jobs nationally, a hand packager, with 75,000 full-time jobs nationally, and a hospital cleaner/laundry aide, with 50,000 full-time jobs nationally.  (R. 57.)  The ALJ changed the hypothetical to reduce the person to brief and superficial interactions with coworkers and the general public, and the vocational expert testified the person could still work the three example positions.  (R. 58.)  The ALJ then added the restriction that the person would be off-task 20% of the workday and would have two to three unexcused absences, and the vocational expert testified those additional restrictions would prevent the person from holding any position.  (R. 58.)

### 4.     The ALJ's Determination

The ALJ followed the five-step sequential evaluation for disability under SSA regulations.  The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since February 4, 2019.  (R. 18.)

At step two the ALJ found that Plaintiff had the following impairments: depression, anxiety, PTSD, and alcohol use disorder; however, he found the impairments were not severe alone or in combination.  (R. 18–19.)  The ALJ found Plaintiff's impairments could reasonably be expected to produce her described symptoms, but her statements about the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with other evidence.  (R. 20.)  He also found that Plaintiff responded well to treatment with no significant functional restrictions.  (R. 20.)

The ALJ reviewed the treatment records from Giles, Rauber, Szulgit, and Schreiber starting in November 2018, noting at the outset Plaintiff's self-reported

16

improvements in mood despite "situational stressors" like her loss of housing, and her generally normal or benign mental status examinations. (R. 20–21.) The ALJ highlighted Plaintiff's reports of feeling depressed, anxious, stressed, and hopeless due to her struggles finding a house, mixed with Plaintiff's suggestions that her depression was "manageable" with medication. (R. 20–21.) He also noted that Plaintiff reported her mood and symptoms became worse when she took her medication inconsistently or not at all, but that in September 2019, Plaintiff told Schreiber that she had no complaints, was focused on getting a job and housing, and was keeping a consistent medication regime. (R. 21.) The ALJ described Plaintiff's medication regime falling off by January 2020, consistent depression, and continued anxiety over her housing situation. (R. 21.) He also noted Plaintiff's admission to an emergency department connected to drinking and drug use in April 2020, and Rauber's subsequent inquiries into Plaintiff's substance use, which Plaintiff generally denied. (R. 21–22.) The ALJ also pointed to "situational stressors" with Plaintiff's roommate and her son in 2020, along with consistently anxious, depressed, and irritable mood but otherwise normal mental status exams. (R. 22.)

The ALJ found the state agency consultant's medical opinions persuasive, noting that they agreed Plaintiff experienced only mild limitations from her impairments, so they were not severe. (R. 22.) They reflected that Plaintiff's symptoms were initially well-controlled without medication, and her exacerbation of symptoms "was directly related" to her housing instability. (R. 22.) The ALJ found the opinions consistent with the record, which he found showed that Plaintiff's symptoms worsened with unstable housing, other situational stressors, poor medication compliance, and possible substance

17

abuse, but otherwise mental status exams were normal save for inconsistent mood.  (R. 22.)

The ALJ found Giles's and Rauber's medical opinion statements less persuasive. (R. 23.)  He found that their records generally showed treatment and medication improved Plaintiff's symptoms, Plaintiff's anxiety in 2019 focused on situational stressors like housing and finances, Plaintiff told her primary care provider in September 2019 that her symptoms were well-managed by medication, and after that Plaintiff did not receive further treatment until January 2020.  (R. 23.)  The ALJ pointed out that "[w]hen the claimant resumed treatment in January 2020, it appears it was based on the advice of her representative."  (R. 23.)  The ALJ found the mental status exams during 2020 were largely normal except for mood abnormalities, and that Plaintiff's symptoms were exacerbated by situational stressors like conflict with her roommate and inconsistent medication compliance, but calmed when she began staying with a friend and when she reported good results from consistent medication.  (R. 23.)  The ALJ concluded these records did not support the work-related limitations Giles and Rauber indicated in their medical opinion statements.  (R. 23.)  The ALJ also highlighted the apparent inconsistency between the marked and serious limitations the providers indicated in one report from April 9, 2019, compared to moderate limitations in the other report from the same day.  (R. 22–23.)

The ALJ observed that regarding "claimant's recent difficulty with anger and interpersonal conflict with her roommate, the record shows that there may be a component of substance abuse, about which Ms. Rauber believes the claimant may be

minimizing or not entirely forthcoming." (R. 23.)  The ALJ also noted recent decreased compliance with treatment and attendance with counseling.  (R. 23.)

The ALJ found that Plaintiff's impairments imposed only mild limitations in all areas of functioning, and so concluded that Plaintiff's impairments were not severe, and stopped the evaluation at step two.  (R. 24–25.)

## II.   DISCUSSION

Plaintiff argues the ALJ's findings at step two are not supported by substantial evidence and the ALJ failed to apply appropriate legal standards when weighing the medical opinions and Plaintiff's self-reports of her symptoms.  (Pl's Mem. at 16.)

### A.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether the ALJ made a legal error and whether substantial evidence in the record as a whole supports the decision.  *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021); 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted).  "Substantial evidence in the record as a whole requires a more searching review than the substantial evidence standard."  *Grindley*, 9 F.4th at 627; *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  A court must consider evidence that fairly detracts from the ALJ's decision.  *Grindley*, 9 F.4th at 627.  But a court may not "reweigh" the evidence or reverse the ALJ's decision "merely because substantial evidence would have supported an opposite decision."  *Id.*  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from

the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* A court will disturb the ALJ's decision only if it finds from the evidence as a whole that the decision "falls outside the available zone of choice." *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021).

A court must also ensure the ALJ adequately explained his findings and conclusions. The ALJ's determination must indicate which evidence the ALJ relied on and which he rejected, and his reasons for doing so, but he need not cite specific facts supporting specific findings and conclusions. *See Vance v. Berryhill*, 860 F.3d 1114, 1117–18 (8th Cir. 2017) (holding ALJ's findings at step four cured lack of elaboration at step three); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (holding that the ALJ need not discuss every piece of evidence and not citing evidence does not indicate the ALJ did not consider it). But "inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand" if they might change the outcome of the determination; an ALJ, not a reviewing court, must resolve those issues. *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005). *See also Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822–23 (8th Cir. 2008) (reversing when the ALJ's factual findings were insufficient for the court to conclude whether substantial evidence supported the determination); *David S. v. Saul*, No. 19-CV-3137 (ADM/LIB), 2021 WL 467348, at *3 (D. Minn. Jan. 25, 2021), *report and recommendation adopted*, 2021 WL 465281 (D. Minn. Feb. 9, 2021) ("a reviewing court cannot search the record to find other grounds to support the decision of the ALJ" when the decision does not provide that support) (cleaned up).

**B.      The Step Two Severity Determination**

The ALJ follows a five-step sequential evaluation process for determining disability for SSI.  20 C.F.R. § 416.920(a)(4).  The five steps are: (1) whether the claimant's work activity, if any, is substantial gainful activity; (2) whether the claimant has any severe, medically determinable impairments meeting the duration requirement; (3) whether one or more of those impairments meets or medically equals the criteria of a listed impairment; (4) whether the claimant's residual functional capacity (RFC) allows her to do past relevant work; and (5) whether the claimant's RFC and age, education, and work experience allow her to adjust to other available work.  *Id.* (a)(4)(i)–(v).  If the ALJ determines at any step that the claimant is disabled or not disabled, the ALJ halts the evaluation.  *Id.* (a)(4).

Plaintiff challenges the ALJ's step two determination that her impairments were not severe.  To be severe, the impairment or combination of impairments must "significantly limit [a claimant's] physical or mental ability to do basic work activities."[3] 20 C.F.R. § 416.920(c).  However, as the Eighth Circuit explained in *Hudson v. Bowen,* a *de minimis* standard applies to the step two severity determination.  870 F.2d 1392, 1395-96 (8th Cir. 1989) (citing *Bowen v. Yuckert,* 482 U.S. 137, 158 (1987)).  Specifically, "only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits at step two." *Id.* at 1395-96 (cleaned up).  The court in *Hudson* went on to note that this approach is reflected in the Social Security

---

[3] Basic work activities are "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.922(b) (listing examples).

regulations.  "[A]n impairment is found not severe … when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have *no more than a minimal effect* on an individual's ability to work."  *Id.* at 1396 (cleaned up) (citing SSR 85-28, 1985 WL 56856 (S.S.A. 1985); *Yuckert v. Bowen,* 841 F.2d 303, 306 (9th Cir. 1988)).  In other words, "the sequential evaluation process can be terminated at step two only in cases where there is no more than a minimal effect on the claimant's ability to work."  *Hudson,* 870 F.2d at 1396 (reversing and remanding for further consideration where the ALJ had "applied too stringent a standard" in terminating the evaluation at step two).

In Social Security Ruling 85-28, the SSA noted its concurrence with recent case law on the proper implementation of the step two analysis.

> For example, *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), and *Estran v. Heckler*, 745 F.2d 340 (5th Cir. 1984), stated that "an impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." As *Baeder v. Heckler*, No. 84-5663 (3rd Cir. July 24, 1985), suggested, the severity regulation is to do no "more than allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working."

SSR 85-28, 1985 WL 56856, at *1 (S.S.A. 1985).  Thus, "[a] claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process."  *Id.* at *3.   Finally, the ruling admonishes that

"[g]reat care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued." *Id.* at *4.

When it comes to mental impairments, the ALJ evaluates severity by rating the functional limitations they cause in four broad areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 416.920a(b)–(c). The ALJ rates a claimant's limitations in each area as none, mild, moderate, marked, or extreme. *Id.* (c)(2), (4). No or mild limitations in all areas generally mean non-severe impairments unless evidence indicates "more than a minimal limitation in [the claimant's] ability to do basic work activities." *Id.* (d)(1).

The claimant bears the burden to show a severe impairment or combination. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). As the foregoing discussion shows, the severity requirement is not onerous, "but it is also not a toothless standard." *Kirby,* 500 F.3d at 708 (finding substantial evidence supported the ALJ's determination that the claimant had not shown a medically severe mental impairment, and observing that the court had "upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing").

Plaintiff argues that in reaching the conclusion that Plaintiff had failed to show a medically severe impairment, the ALJ improperly discredited her subjective complaints

of symptoms and discounted the opinions of her treating mental health providers, and that

he gave undue weight to the opinions of the state agency consultants. She contends that

if the ALJ had given appropriate consideration to these sources, the ALJ should have

found that Plaintiff had made the *de minimis* showing required to meet her burden at step

two and that the ALJ should have proceeded to the remaining steps in the evaluation.

### C.   Whether the ALJ Improperly Discredited Plaintiff's Subjective Complaints of Symptoms

Plaintiff argues the ALJ improperly discredited her subjective symptoms as

inconsistent with the record as a whole. (Pl's Mem. at 24.)

At step two, the ALJ must consider a claimant's symptoms unless the objective

medical evidence alone establishes a severe impairment or combination of impairments.

SSR 16-3p, 2017 WL 5180304, at *5 (S.S.A. October 25, 2017); 20 C.F.R.

§ 416.929(d)(1). After finding the claimant's impairments could cause the symptoms, the

ALJ must evaluate the persistence and intensity of the symptoms and whether they

functionally limit a claimant's capacity for work, considering all medical and non-

medical evidence. 20 C.F.R. § 416.929(c). The ALJ must evaluate the following factors:

(i) daily activities; (ii) the location, duration, frequency, and intensity of symptoms; (iii)

precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects

of medication; (v) other treatment; (vi) measures taken to relieve symptoms; and (vii)

other relevant factors. *Id.* (c)(3).

Through this evaluation, the ALJ must describe the extent to which limitations

caused by symptoms "can reasonably be accepted as consistent with the objective

medical evidence and other evidence." *Id.* (c)(4); SSR 16-3p, 2017 WL 5180304, at *2

(S.S.A. October 25, 2017). The ALJ may discredit subjective complaints only if they are

inconsistent with the above factors as shown by the record as a whole, not solely based

on lack of supporting objective medical evidence. 20 C.F.R. § 416.929(c)(2)–(3);

*Nowling v. Colvin*, 813 F.3d 1110, 1114 (8th Cir. 2016). If the subjective complaints

come in part from a claimant's testimony, the ALJ must determine the claimant's

credibility and explain the finding. *Nowling*, 813 F.3d at 1114. The ALJ need not

address every factor so long as the credibility assessment is supported by "good reasons

and substantial evidence." *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (citing *Cox

v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006).) Symptoms that impair work-related

functioning and are consistent with the evidence satisfy the showing for severe

impairment at step two. 20 C.F.R. § 416.929(c)(4).

Plaintiff argues the ALJ inappropriately discounted her subjective complaints of

symptoms based on treatment non-compliance and a gap in treatment between May 2019

and January 2020 while she was homeless, as well as situational stressors and suspicions

of substance abuse. (Pl's Mem. at 25–28.)

The ALJ summarized the reasons for discounting Plaintiff's statements:

> In sum, I do not find the claimant's allegations to be consistent
> with the medical evidence. As discussed above, the claimant's
> complaints from the application date through May 2019 were
> almost entirely related to inconsistency in her housing
> situation, and anxiety related to periods of homelessness and
> other domestic and financial instability. The record also shows
> significant improvement in her symptoms when she is
> compliant with her prescribed treatment, which is also
> reflected in her primary care reports in September 2019. While

25

the claimant has had some recent difficulty with anger and interpersonal conflict with her roommate, the record shows that there may be a component of substance abuse, about which Ms. Rauber believes the claimant may be minimizing or not entirely forthcoming. There has also been less compliance with prescribed treatment, as well as less attendance with counseling, which she initially restarted in January 2020 on recommendation of her attorney.

(R. 23.)

Plaintiff argues the record shows that she was homeless and transient during large portions of 2019, that she did not always have telephone access, and that she unknowingly let her insurance lapse in February 2020. (R. 322, 410, 417, 421, 428, 468–69.) Plaintiff argues these factors explain her inability to consistently treat between May 2019 and January 2020, and that therefore, to the extent the ALJ discounted her subjective account of the severity of her symptoms during that period on the ground that she did not consistently seek treatment for them, the ALJ should have explicitly considered these alternative explanations. (Pl's Mem. at 27.) Plaintiff also contends that although she may not have attended therapy regularly during the times she was homeless, she did continue with her medications and she promptly restarted therapy when she had stable housing. (*Id.* at 28.)

It is not clear precisely how the ALJ factored into his determination Plaintiff's periodic failure to take her medication regularly and/or to attend therapy. One interpretation is that the ALJ discounted Plaintiff's subjective account of the severity of her symptoms overall because he found her claims about the severity of her symptoms to be belied by her failure to take her medication and attend therapy regularly. Another

interpretation, not necessarily exclusive of the first, is that he concluded from the medical records that so long as she *did* comply regularly with her treatment regimen, her symptoms were not sufficiently persistent or intense to have "more than a minimal effect on [her] physical or mental ability(ies) to perform basic work activities," and therefore she was not disabled, despite her claims to the contrary.  In either case, the ALJ also took into account the apparent role of situational stressors in exacerbating Plaintiff's symptoms, and concluded that in the absence of those stressors and with regular medication and treatment, Plaintiff's symptoms would have no more than a minimal effect on her ability to perform basic work activities.

If the ALJ discredited Plaintiff's testimony about the severity of her symptoms on the ground that she did not consistently seek treatment for them,[4] he erred in failing to assess and address other reasons why she might not have accessed treatment regularly during those periods.  While treatment non-compliance may support an ALJ discrediting a claimant's subjective complaints, *Hensley v. Colvin*, 829 F.3d 926, 934–35 (8th Cir. 2016), the regulations recognize that a claimant may fail to comply for a variety of reasons, only some of which bear on the credibility of the subjective symptoms, so the ALJ must explain how he considered those reasons in the determination.  SSR 16-3p, 2017 WL 5180304, at *9–10 (S.S.A. October 25, 2017) ("We will not find an individual's symptoms inconsistent with the evidence in the record on [the basis of non-compliance with treatment] without considering possible reasons he or she may not comply with

---

[4] The Commissioner's response seems to endorse the view that that this was the ALJ's point in citing Plaintiff's noncompliance with treatment.  (Def's Mem. at 16–17.)

27

treatment or seek treatment consistent with the degree of his or her complaints . . . We will explain how we considered the individual's reasons.").

Here, the ALJ identified Plaintiff's gaps in therapy and inconsistent medication compliance when reviewing the records, assessing the persuasiveness of the various medical opinions, and assessing the consistency of Plaintiff's subjective symptoms.  (R. 21–23.)  But although the ALJ acknowledged Plaintiff's homelessness as a "situational stressor," there is no indication he inquired at the hearing or considered in his determination homelessness or other possible explanations, including the loss of her phone, her insurance, or even the effects of the illness itself, for gaps or irregular compliance in accessing treatment or taking her medications during certain periods. Therefore, insofar as he discredited her testimony because of perceived treatment noncompliance, he erred in not explicitly considering other explanations.  *See Kirby v. Sullivan*, 923 F.2d 1323, 1328 (8th Cir. 1991) (holding that the record suggested the claimant's mental impairment and complex medication regime may have prevented her compliance with medications, so the ALJ should have considered her ability to comply before assuming the non-compliance was willful or indicative of exaggerated symptoms); *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984) ("a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be, and in this case is, an independent basis for finding justifiable cause for noncompliance.")

Furthermore, the record does not support the ALJ's apparent conclusion that Plaintiff's treatment noncompliance continued into 2020.  While the ALJ stated, seemingly in reference to Plaintiff's treatment course during 2020, that "[t]here has been

less compliance with prescribed treatment, as well as less attendance with counseling"
(R. 23), the record does not disclose any missed appointments or failures to take
medication after the first meeting with Rauber in January 2020.  Plaintiff admitted
inconsistent medication use at that visit, but subsequently she reported consistent
medication use, and received treatment from mental health providers in February, March,
April, June, and July 2020, notwithstanding the onset of the COVID pandemic in March
2020.  *See Key v. Saul*, No. 4:19-CV-00647-JTK, 2021 WL 1134775, at *8 (E.D. Ark.
Mar. 24, 2021) (concluding substantial evidence did not support a finding of gaps and
noncompliance in treatment when the ALJ did not cite evidence and the Court could not
identify any in the record).

But even if the ALJ did not disbelieve Plaintiff's testimony on account of her
failure during certain periods to regularly take her medication or attend therapy, but
instead discounted her claims about the severity and persistence of her symptoms as
inconsistent with the medical records that showed improvement in those symptoms
during periods of regular treatment, the Court finds that the records do not support the
definitive contrast he attempts to draw in one key respect—interacting with others.

First, even though Plaintiff and her providers reported improvement in her
symptoms when she took her medication regularly, the Court notes that over the course
of 2018 to 2020, Rauber increased Plaintiff's dosage of sertraline twice, hydroxyzine
once, switched from hydroxyzine to quetiapine, and increased quetiapine once, all to help
Plaintiff better manage both her chronic and acute symptoms.  (R. 318, 438, 469, 510,
518.)  "[I]t is possible for a person's health to improve, and for the person to remain too

disabled to work." *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003). *See also Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("[I]ndications in the medical record that [claimant] was 'doing well,' . . . for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity.") The repeated need to increase dosage and change medication do not support a finding that Plaintiff's symptoms were well-managed throughout that period even when she took her medication regularly.

Second, even during periods of medication and treatment compliance the medical records reflect that Plaintiff repeatedly expressed anxiety about being out in crowds and a desire to avoid crowds or unfamiliar people, including reporting in February 2019 that being around others caused anxiety and she could not identify a job without other people (R. 328); in May 2019 that she was anxious about having to share a bathroom in her then-current housing (R. 410) and had thoughts of hurting others in the building (R. 418); in April 2020 that she was experiencing heightened anxiety and agitation around others due to the pandemic, including crowds on the bus (R. 508), and isolating in her bedroom except to go out for essentials (R. 501); in April through June 2020 that she was having ongoing conflicts with her roommate "needling" her that led her to thoughts of violence and explosive outbursts, and at one point to becoming intoxicated and attacking a stranger in public (R. 501, 508, 516, 518, 522); and in June 2020 that she was irritable with and shouting to the point of hoarseness at people in the community to stay away from her (R. 522). However, she reported mental health improvements while with trusted friends and family (R. 325, 428, 522), and there are no reports of inappropriate behavior

toward therapists, although there are a number of mentions of irritable, anxious, and/or guarded mood during appointments.  Her testimony and behavior at the hearing reflected these same issues.  She testified that she did not go out for shopping because she hyperventilated around crowds.  (R. 52.)  She took a pill to calm herself during the hearing and yet was anxious and irritable to the point that she could not restrain herself from reacting out loud to the vocational expert's testimony despite directions from the ALJ and her representative that she not speak during that portion of the hearing.  (R. 48, 53, 58–62.)

While the ALJ noted some of Plaintiff's problems interacting with others when reviewing the records and analyzing this functional area, the only evidence he cited when discrediting Plaintiff's symptoms in this area was her conflict with her roommate, which he discounted on the bases that substance abuse "may" have been involved, and that Plaintiff could avoid the conflict by distancing herself from her roommate.  (R. 23–24.) The record provides only the single documented instance of Plaintiff being intoxicated, when she attacked a stranger and the police took her to the emergency department.  (R. 484–485.)  And even if alcohol abuse was involved, the ALJ did not explain why that would undermine the conclusion that Plaintiff's impairments were severe.  As with Plaintiff's failure to consistently take her medication, the ALJ did not discuss whether alcohol abuse could have been caused or contributed to by Plaintiff's other impairments, as opposed to viewing it as a reason to doubt the severity of those impairments.

The ALJ's further finding that Plaintiff's problems interacting were limited to her roommate failed to account for Plaintiff's reports that she was minimizing interactions

with public and strangers by isolating in her bedroom except for going out for essentials.

Plaintiff seemingly limited her ability to come into conflict with others, save for her

roommate who she could not avoid.  Furthermore, the ALJ did not address the obvious

concern that the same mental impairments that caused Plaintiff to act out when stressed

by her roommate could also affect her ability to interact with others in the workplace as

well.  Moreover, the situational stressor of homelessness, cited several times by the ALJ,

would not have been in play when she was at odds with her roommate.  In any event,

situational stressors are a part of life generally and work in particular, but the ALJ's

decision did not address whether as a result of her mental health issues, Plaintiff's ability

to respond appropriately to those situational stressors was impaired to such an extent that

it would have more than a minimal effect on her ability to perform basic work activities.

On the other hand, there was substantial evidence to discount Plaintiff's self-

reported symptoms when it comes to the areas of concentration, persistence, or pace;

understanding, remembering, or applying information; or adapting or managing oneself.

Plaintiff consistently reported feeling improved and better-managed anxiety and

depression when taking her medication regularly, though it did not completely alleviate

her symptoms, and she recognized that her symptoms worsened with inconsistent

medication.  (R. 314, 317, 356, 417, 430, 437.)  Rauber noted the same.  (R. 318, 518.)

Furthermore, Plaintiff's mental status exams consistently showed fair insight and

judgment, with isolated moments of poor or impaired judgment, and good to normal

concentration, with depressed, anxious, dysphoric, or irritable mood or affect.  (R. 316,

321, 323, 327, 329, 347, 349, 352, 357, 411, 418, 451, 438, 469, 473, 503, 509, 517, 524,

531–532.)  The exams noted no other mental functioning concerns.  Plaintiff rarely

reported concentration concerns, (R. 314, 437), and much more often reported good or

fair concentration, (R. 317, 357, 468, 508, 516–517.)  Plaintiff also regularly reported

insomnia, and otherwise reported interest/enjoyment, appetite, and energy that varied

between poor and good.  (R. 317, 357, 468, 508, 516–517.)  She also reported variously

and repeatedly playing phone games and word search puzzles as a distraction, reading,

and watching TV and movies, (R. 314, 437, 468, 473, 501, 522), even playing phone

games when taking her medication inconsistently, (R. 437, 468.); she also once reported

cooking and cleaning for her housemates.  (R. 473.)  Thus, the ALJ could reasonably find

that these records taken together reflect that even on her worst days, Plaintiff's anxiety

and depression seemingly never caused more than mild impacts on concentration,

persistence, or pace; understanding, remembering, or applying information; or adapting

or managing.  The ALJ therefore reasonably discounted Plaintiff's subjective reports of

symptoms in those areas.  However, for the reasons discussed above, the Court finds

there is not substantial evidence to discredit Plaintiff's symptoms with regard to

interacting with others.

### D.    Whether the ALJ Failed to Appropriately Consider Medical Opinions

#### 1.    Giles's and Rauber's Medical Opinions

Plaintiff next argues that the ALJ improperly discounted Giles's and Rauber's

medical opinions regarding the severity of her impairments.  (Pl's Mem. at 30.)

The ALJ determines how persuasive he finds a medical source opinion based on

its supportability, consistency, the source's treating relationship with the claimant

(frequency of examinations, purpose, extent, examining relationship), the source's medical specialization, and other factors such as the source's familiarity with the SSA program and evidentiary requirements. 20 C.F.R. § 416.920c(c). As a result of a significant change in that regulation effective for applications filed after March 27, 2017, the ALJ no longer "defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* (a). Rather, the "factors of supportability . . . and consistency . . . are the most important factors" to be considered when the ALJ determines how persuasive she will "find a medical source's medical opinions or prior administrative medical findings to be." *Id.* (b)(2). The ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in the determination. *Id.* An ALJ may discount a medical source's opinion if he concludes the opinion is inconsistent with treatment notes or that the source overly relied on a claimant's subjective complaints rather than objective medical evidence. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011); *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

The opinions identify a variety of severe limitations in Plaintiff's work-related abilities for focusing, attending work, accepting instructions and criticism from supervisors, responding to changes (R. 333, 436), working with others without being distracted by them or disrupting them or showing extreme behaviors, work without unreasonable rest periods, and dealing with stress. (R. 434). They also rated Plaintiff as markedly limited in her ability to interact with others and concentrate, persist, or maintain

pace; and moderately limited in understanding, remembering, or applying information and adapting and managing herself.  (R. 334, 436.)  The ALJ found Giles's and Rauber's opinions less persuasive because "they are not supported by their own treatment records" and were inconsistent with the remaining records.  (R. 23.) In so doing, the ALJ cited the good medication management, Plaintiff's anxiety focused on her housing instability, her long gap in treatment in 2019 and return in January 2020 on the advice of her representative, less engagement with treatment in 2020, Rauber's suspicions of alcohol abuse, mental status exams generally showing minimal concerns, and how Plaintiff's 2020 anxiety focused on her roommate.  (R. 23.)

Plaintiff argues the ALJ failed to address the supportability and consistency of the opinions based on the records, failed to identify any inconsistency, and cherry-picked records that support the finding.  (Pl's Mem. at 30–37.)  The Commissioner counters that the ALJ properly explained the inconsistent evidence, and highlights that Plaintiff's gap in therapy followed by a return based on the advice of her representative allowed the reasonable inference that Plaintiff's impairments were less severe than the opinions alleged and that Plaintiff was seeking treatment to produce evidence for her disability application rather than to aid her impairments.  (Def's Mem. at 17–20.)

Because the ALJ relied on the same evidence in the record to discredit these opinions and to discredit Plaintiff's subjective symptoms, the Court's discussion above largely applies here.  The ALJ could reasonably conclude that the severe limitations Giles and Rauber identify for work abilities relevant to the functional areas of concentration, understanding, and adapting and managing are not supported by Plaintiff's symptom

management on medications, generally benign mental status exams save for anxious, depressed, or irritable mood, variable and inconsistent reports of any functional impacts from her symptoms. In these respects the ALJ addressed the evidence of record, did not cherry-pick it, and adequately explained his decision that the medical provider opinions were not persuasive.

The same is not true, however, for the ALJ's consideration of the limitations expressed in Giles's and Rauber's opinions related to Plaintiff's ability to accept criticism from supervisors and work with others without being distracted, distracting them, or showing extreme behaviors. The records discussed above of Plaintiff's anxiety around crowds and strangers, her violent thoughts towards others when forced into close proximity with them, her efforts to avoid others and isolate especially during the pandemic, and her on-going conflict with her roommate regarding his interactions with her are consistent with the opinions' limitations on Plaintiff's ability to appropriately interact with supervisors and coworkers (largely strangers and individuals who would impose rules and critique Plaintiff's behavior). Overall, the evidence in the record does not support the ALJ discrediting Giles's and Rauber's opinions on Plaintiff's limitations in interacting with others.

### 2.    State Agency Consultants' Opinions

Plaintiff argues the ALJ found the state agency consultants' opinions were persuasive without addressing their consistency and supportability, that he discussed them in a way that supported the ALJ's desired outcome, and that the opinions were issued before a large portion of the records showing Plaintiff's severe impairments were

created.  (Pl's Mem. at 37–41.)  The Commissioner responds that the ALJ correctly assessed the consistency and supportability of the opinions against all the evidence in the record including the portion created after the opinions were issued, and the record as a whole supports the ALJ finding the opinions persuasive that Plaintiff had only mild limitations.  (Def's Mem. at 21–24.)

The ALJ reviews the opinions and findings of state agency medical consultants using the same factors as for any other medical opinion, focusing most importantly on their consistency and supportability in light of the evidence as a whole (even evidence unavailable to the consultants when forming the opinions).  *See* 20 C.F.R. § 416.920c.

The consultants agreed that Plaintiff had only mild limitations.  The ALJ found the opinions consistent with and supported by the records showing Plaintiff's medications controlled her impairments, her symptoms were exacerbated by her housing instability and improved with stable housing, she ceased therapy after May 2019 and returned in 2020 on her representative's advice, poor compliance with medication and treatment combined with situational stressors and suggestions of substance abuse contributed to her exacerbated symptoms in 2020, and her mental status exams were generally normal save for mood inconsistencies.  (R. 22.)

Based on the records discussed and the reasons explained above, the Court finds substantial evidence supports the ALJ finding these opinions persuasive except for the question of Plaintiff's limitations in interacting with others.  The evidence as a whole is not consistent or supportive of the opinions' finding mild limitations interacting with others.  Even when medicated and attending therapy, Plaintiff's anxiety around others

manifests with thoughts of violence, avoiding others, shouting and other outbursts, anger, and argumentation.

Overall, the ALJ's findings regarding the persuasiveness of the medical opinions are supported by substantial evidence in the record except for Plaintiff's limitations interacting with others. The evidence cited by the ALJ to discount Giles's and Rauber's opinions and favor the consultants' opinions on this functional area is not substantially supported by the record.

### E.    Whether the ALJ's Finding that Plaintiff's Impairments Were Not Severe is Supported by Substantial Evidence in the Record as a Whole

Plaintiff argues the record as a whole makes the *de minimis* showing through her consistent diagnoses of PTSD and MDD, prescription medications of increasing dosages for depression and anxiety, and multiple treating source medical opinions assessing more than mild work-related limitations. (Pl's Mem. at 21–24.) The Commissioner responds that the record as a whole supports the ALJ's findings that Plaintiff's impairments were well-controlled by prescribed medication and were exacerbated by situational stressors and inconsistent treatment, her symptoms were not as severe as alleged due to her gap in treatment while her symptoms were well-controlled by medication and she sought work as a home health aid, her return to therapy in January 2020 as suggested by her representative raised doubt about the severity of her impairments, and her mental status exams were largely free from concerns save for depressed and anxious mood and affect. (Def's Mem. at 9–14.)

The ALJ determined that Plaintiff's impairments caused only mild limitations in

the four functional areas.  (R. 24.)

The first functional area is understanding, remembering or applying information. In this area, the claimant has mild limitation. Mental status examinations consistently show that the claimant has "intact" memory and average intelligence (Ex. 8F). The State agency consultants also opined that the claimant has mild limitation in this domain (Ex. 1A at 4; 3A at 5). The record does not otherwise reflect any significant cognitive deficits.

The next functional area is interacting with others. In this area, the claimant has mild limitation. While the claimant reports difficulty in crowds and having anxiety around others, the record generally reflects that her problems interacting since she returned to treatment have specifically focused on her roommate, except for an episode of grabbing a stranger while intoxicated, resulting in her April 2020 emergency department treatment. The claimant's anxiety has otherwise been related to situational stressors and housing instability. The State agency consultants considered the claimant to have mild limitations for interacting with others (Ex. 1A at 4; 3A at 5).

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. Similar to the claimant's cognitive functioning, mental status examinations consistently show that the claimant's concentration in a clinical setting has been "intact," and she has normal thought processes. As discussed above, the claimant's allegations regarding problems with concentration and focusing are not consistent with the totality of the record. A finding of mild limitation in this domain is also supported by the opinions of the State agency consultants (Ex. 1A at 4; 3A at 5).

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. The medical evidence shows that the claimant's anxiety has primarily been related to coping with instability in her housing situation; given that the claimant has had periods of homelessness or living in shelters, such a response is reasonable. The claimant has also improved when she is compliant with medication, and considered her anxiety and depression to be "well controlled"

in late 2019, after she obtained more stable housing and began applying for a job. Mental status examination have generally shown that the claimant has retained at least "fair" insight and judgment, except for her "mildly impaired" judgment in June 2020, and assessments of "poor" judgement on January 17 and February 5, 2019 (Ex. 4F at 15, 18; 8F at 75). The State agency psychological consultant opinions also support a finding of mild limitation in this domain (Ex. 1A at 4; 3A at 5).

(R. 24.)  These determinations for the first, third, and fourth areas are supported by substantial evidence.  Plaintiff's mental status exams reflect no concerns in these areas, Plaintiff's medication seemingly improved and managed her mood, her therapists' notes showed that she recognized that her medications helped her and that her impairments caused irritability, agitation, anger, and anxiety around people which she sought to avoid through life structure, and her descriptions of her life activities (for example: feeling well enough to job hunt in mid to late 2019, playing phone games and word puzzles, taking steps to avoid aggravating her symptoms, feeling better when staying with family or friends) reveal few limitations.  The state agency consultants' opinions are consistent with these findings.

Further explanation is needed regarding Plaintiff's job hunt.  A claimant seeking work while applying for benefits is inconsistent with disability, *see Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001), at least as it suggests a claimant does not perceive her impairments preventing her potential to work.  During the gap in therapy between May 2019 and January 2020, Plaintiff reported to her primary care provider in September that she was living with her parents and seeking a job as a home health aide, and she was hired in October 2019.  (R. 237, 428.)  The ALJ confirmed with Plaintiff in the hearing

40

that she never started working after being hired; the record shows no earnings in 2019 or 2020.  (R. 46, 238.)  The record and the hearing do not disclose why Plaintiff never started.  The ALJ did not cite the hiring anywhere in the determination.  Plaintiff's job hunt suggests that she felt capable of working at least in September and October 2019, and lends some support to the ALJ's finding that Plaintiff's symptoms improved quite a bit when she had stable housing.

But the ALJ's finding of only mild limitation in interacting with others is not supported by substantial evidence for the reasons discussed in parts C and D.  Plaintiff's subjective statements about her anxiety around crowds and the public, Giles's and Rauber's opinions about her inability to interact appropriately with supervisors and coworkers, and the evidence previously discussed regarding her interactions with others are all consistent with greater than mild limitation in this functional area.  The Court finds that Plaintiff has satisfied the *de minimis* showing at step two that her impairments severely limit her ability to interact with others, and remand is appropriate for the Commissioner to complete the remaining steps in the evaluation.

The Court does not address Plaintiff's and the Commissioner's arguments over whether the record satisfies Plaintiff's showing at step three, (Pl's Mem. at 18, 24; Def's Mem. at 14), because the ALJ stopped the analysis at step two.

## III.  CONCLUSION

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.    Plaintiff's Motion for Summary Judgment [ECF No. 21] is **GRANTED**;

2.      Defendant's Motion for Summary Judgment [ECF No. 24] is **DENIED**; and

3.      This matter is **REMANDED** to the Commissioner for reconsideration of Plaintiff's claim for benefits by proceeding to step three and, if appropriate, through to step five.  In this analysis, based on the record and the discussion here, the Commissioner must reconsider the consistency of Plaintiff's subjective complaints of symptoms and the consistency and supportability of the medical opinions, including consideration of impairment due to substance abuse, alternative explanations for treatment non-compliance, and the effect of Plaintiff's impairments on her ability to function in the workplace in the presence of reasonably foreseeable situational stressors.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 21, 2022                              *s/ Hildy Bowbeer*
                                                  HILDY BOWBEER
                                                  United States Magistrate Judge